SPROUL et al. v. PARKS et ux.

No. 7234. Decided October 18, 1949. (210 P. 2d 436.)

See 12 C. J. S., Brokers, sec. 85. Commissions for brokers, see note, 3 A. L. R. 532. See, also, 8 Am. Jur. 1064.

*Romney & Nelson,* Salt Lake City, for appellants.

*T. Quentin Cannon,* Salt Lake City, for respondents.

McDONOUGH, Justice.

Plaintiff sued to recover a real estate broker's commission. Defendants answered denying that plaintiffs procured a

buyer who was either willing or able to purchase on the terms specified in the listing contract. Defendants also counter-claimed for damages, alleging that plaintiffs maliciously clouded title to the property by filing of record an unauthorized mortgage. From a judgment of no cause of action on the amended complaint, and from judgment on the counterclaim, plaintiffs appeal.

Plaintiffs attack the findings and judgment as contrary to the evidence and as contrary to law. This being a law case, if there is any substantial competent evidence to support the findings, they will not be disturbed.

It is undisputed that on November 28, 1945, defendants listed their real estate in Salt Lake City with plaintiffs. The listing contract specified the purchase price and terms of sale. No provision was made for acceleration of payments. The defendants were not interested in a cash deal at that time. Said listing contract provides, inter alia:

"During the life of this contract, if you find a buyer who is ready, able and willing to buy said property or any part thereof at said price and terms, or any other price or terms to which I may agree in writing, * * * I agree to pay you the Salt Lake Real Estate Board commission on such sale."

Two days before expiration of the listing period, December 26, 1945, plaintiff Sproul presented to defendants a form of preliminary agreement signed by one Devenish, the terms of which provided for a cash sale. Defendants declined to entertain such proposal or any other proposal which would not conform to the listing contract. Sproul then wrote over the typewritten insertions the language and figures which would make the offer conform to the listing contract. On the reverse side of each copy of the instrument, Sproul wrote the following to which defendants subscribed their names: "This deal is acceptable provided

the down payment is $8,500.00," with an additional stipulation not material here.

It is admitted that at no time was any written acceptance of the counter-offer of the Parks delivered to them. There is a conflict in the evidence as to whether within the listing period there was any attempted notification that the prospective purchaser had accepted. No final contract of sale was ever signed nor presented; and there is evidence that Devenish refused to sign a final contract of sale unless there were inserted an acceleration clause which would enable him to increase the amount of the payments. There is competent evidence to support the finding of the trial court that the counter-offer was not accepted within the listing period. There is also evidence from which the court could find that the intended purchaser refused to sign unless he could have a cash deal. Consequently, the trial court could properly find that there was no contract of sale made within the listing period, nor any meeting of the minds at any subsequent time, so that plaintiffs never became entitled to a broker's commission.

Contrary to the argument of plaintiffs, the evidence did not compel a finding that the prospective purchaser was ready, able or willing to buy on the terms of the listing during the listing period. Not only could the court find that he failed to accept the counter-offer within that period, but also that he was not able or willing to perform according to the terms of the counter-offer. There was no tender of a down payment. In fact, the intended purchaser deposited only $150 with the brokers, and to procure an additional $7,000 plaintiff Sproul negotiated a loan and signed a note a week later. These two amounts were not sufficient to aggregate the down payment even if the amount of the broker's commission were deducted. When pressed for an explanation of this deficiency, Sproul testified that he was willing to lend Devenish the balance. However, he had made no arrangements therefor and he had not legally obligated himself to do so. His own testimony

shows that Devenish had listed his own property for sale with plaintiffs, out of which he expected to obtain the necessary funds.

Even if defendants had been presented with a written acceptance of their counter-offer within the listing period, which never occurred, they would be entitled to assume that the purchaser then was financially able to perform, not that he might become able sometime in the future. The provision in the broker's listing contract obligates the owner to pay a commission if a sale is procured or a purchaser is procured who is ready, able and willing to perform. That does not mean a purchaser who will not be ready for some time nor one who must sell his home first. See *Cottingham* v. *Smith,* 28 Cal. App. 2d 345, 82 P. 2d 479, and *Willis* v. *Page,* 19 Cal. App. 2d 508, 65 P. 2d 944. The plaintiffs did not perform as brokers and they did not become entitled to a commission. The judgment against plaintiffs must therefore be sustained with respect to the claims pleaded by plaintiffs.

Appellants also contend that there was no competent evidence to support the judgment on the counterclaim. The court awarded defendants $5 special damage and $150 general damages, based upon a finding that plaintiff Sproul with the intent to compel defendants to sell for cash, maliciously and without authority from defendants procured the execution of a mortgage in the sum of $10,000 by the prospective purchasers, and also had said mortgage filed of record, said plaintiffs well-knowing that the mortgagors had no right, title or interest in the property, and that defendants were compelled to employ counsel to procure release of said mortgage.

There is evidence that plaintiff Sproul acted entirely without authority and in disregard of the rights of defendants. He had no written authorization to mortgage the property, and at no time did defendants sign any instrument which would warrant the conclusion that there was

to be a cash deal. The listing contract was in conflict with such a claim. Plaintiffs as brokers were aware of the fact that there was no occasion to have a mortgage placed of record until the closing of a sale, and no sale was actually made. The evidence discloses that plaintiffs repeatedly importuned defendants to agree to a cash sale, and that they refused. By procuring a loan of $10,000 on the security of the property and by getting a loan of $7,000 at the bank on the credit of Sproul, a cash deal could be worked out, and that appeared to be the only basis on which Devenish could buy. Plaintiffs knew that there was no right to mortgage the property in the name of the proposed purchasers if they were buying on an installment contract, since the purchaser could not legally pledge the property rights of the sellers as security for the down payment purchasers would have to make. While Sproul claimed he had procured acceptance of the counter-offer of the Parks by December 28th, the last day of the listing, it is significant that if such acceptance had actually been signed, it was inconsistent with the plan pursued by Sproul; for by having the proposed purchasers execute a note and mortgage for $10,000 on January 2, 1946, and also on the same date obtaining a loan in the further sum of $7,000, there was a manifestation of an intention to consummate a cash sale. It is conceded that at no time did defendants offer in writing to sell on any basis except on an installment contract; and defendants denied that they ever told Sproul that they would be willing to make a cash sale.

It is true that Sproul testified that he knew nothing of the mortgage except that one had been negotiated with a view of consummating a cash sale. He claimed that he had nothing to do with either execution or recordation. However, the mortgage itself shows that he acted as notary, and the officers of the loan company testified that he made all the arrangements, and that he not only directed the company to have the mortgage recorded immediately when no deed had been presented, but that he also paid the recordation fee. The court could therefore properly find that the

mortgage was not only obtained without the knowledge or consent of defendants, but that the recordation thereof was malicious.

Defendants made demand upon the loan company for release of the mortgage as soon as they learned of recordation. The loan company informed them that Sproul had advised the company not to release such mortgage until his attorneys consented, for the reason that there would be litigation over the property. By the middle of January, 1946, plaintiffs admittedly knew that defendants would not consent to any cash deal. The direction to the loan company to refrain from releasing such void mortgage "because there was to be litigation," suggests a determination on the part of plaintiffs to use the unauthorized mortgage on record as a club to aid the unwarranted suit for broker's commission. The contention of plaintiffs that there was no evidence of malicious conduct on the part of plaintiffs, cannot be sustained, for the court could properly find that the recordation and subsequent conduct of plaintiff in preventing release of the mortgage for some time was malicious.

A further contention is made by appellants to the effect that defendants failed to prove damages, and that the judgment on the counterclaim cannot be sustained. Respondents argue that some damage naturally results from placing of record a void instrument which tends to cloud title. The counterclaim was not against the mortgagee, but against plaintiffs who procured the recordation of such mortgage. As to the item of $5, although denominated "special damages," no complaint can be made. The difficulty arises with respect to the item of $150 "general damages." The defendants asked for actual and punitive damages. It is impossible to tell whether the trial court intended to award punitive damages. Respondents refer to a stipulation which appears nowhere in the record. There thus appears a hiatus in the record.

The court found that defendants were compelled to employ counsel to procure the release of the void mortgage,

and they sought not attorney fees as such, but an award of damages which would include the amount they expended for such services. If the evidence would support a finding that the amount of general damages awarded consisted of or included attorneys' fees incurred in procuring the release of the mortgage, such award would have to be upheld. *Dowse* v. *Doris Trust Co.,* 116 Utah 31, 208 P. 2d 956. See also *Malloy* v. *Carroll,* 287 Mass. 376, 191 N. E. 661, and 25 C. J. S., Damages § 50, page 533. But the record would not support such a finding, if made. True, the release of the mortgage by the loan company was not executed until after the filing of the defendants' counterclaim; but no suit had been prosecuted by defendant to clear the title to the realty, nor was there any prayer for such relief in the counterclaim. Assuming that the trial court might determine a reasonable fee for services rendered in the prosecution of the counterclaim before such court without taking any evidence relative thereto, yet if assessed, the amount thereof would be attorneys' fees for services rendered in what was in effect an action for disparagement of title. If such an award of compensatory damages were upheld, it would follow that in circumstances where a collateral proceeding were prosecuted to judgment to clear title to property from an encumbrance, and a subsequent action for disparagement of title were successfully maintained, there should properly be allowed as compensatory damages in the latter suit, an amount for attorneys' fees reasonably incurred in both actions. The authorities will not support such an award.

Defendants, however, contend that in slander of title cases where the conduct of the guilty party is shown to be malicious so that it becomes appropriate to assess punitive damages, the cost incurred by the injured party for counsel fees to vindicate his rights, may be taken into consideration. However, the award below was not for punitive but for compensatory damages. True, the trial court made a finding of malice upon the part of plaintiffs, but the legal malice requisite to support a judgment

for slander of title might not necessarily be such as to support an award for punitive damages. Since the trial court awarded the damages under discussion as compensatory, we must assume that the malice found was merely the legal malice necessary to support a judgment for such damages.

The judgment on the amended complaint of no cause of action is affirmed, and on the counterclaim judgment as to the item of $5 is affirmed, but as to the item of $150 general damages the judgment is reversed and the cause remanded with directions to strike that portion of the judgment. The respective parties will bear their own costs.

PRATT, C. J., and WADE, WOLFE and LATIMER, JJ., concur.